Filed 4/27/21  P. v. Redick CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　v.<br><br>ELTON QUINTIN REDICK,<br><br>　　Defendant and Appellant. | F078711<br><br>(Super. Ct. No. CRF54510)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Tuolumne County.  James A. Boscoe, Judge.

J. Peter Axelrod, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Timothy L. O'Hair, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

Defendant Elton Quintin Redick was convicted by jury of murder in the first degree (Pen. Code, §§ 187, subd. (a), 189, subd. (a); count 1)[1] and kidnapping (§ 207, subd. (a); count 2). The jury also found true two separate enhancement allegations that defendant personally and intentionally used a firearm within the meaning of section 12022.53, subdivisions (b) and (d). Defendant was sentenced to a determinate term of eight years for kidnapping (§ 208, subd. (a)), plus an additional and consecutive 10-year term for the personal and intentional use of a firearm in the commission of the kidnapping (§ 12022.53, subd. (b)). A consecutive indeterminate term of 25 years to life for murder (§ 190, subd. (a)) was also imposed, plus an additional and consecutive term of 25 years to life for the personal and intentional use of a firearm during the commission of the murder (§ 12022.53, subd. (d)).

Defendant contends police obtained his confessions during a videotaped interrogation in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*), which the trial court erroneously deemed admissible. Specifically, defendant argues he invoked his right to silence immediately during a police interview, but he was subjected to ongoing and unwarned interrogation that resulted in a confession. Moreover, when an untimely *Miranda* warning was finally given, defendant claims he invoked his right to counsel, which was also not honored. As a result of these errors, defendant maintains admission of the interrogation video at trial was prejudicial and requires reversal of his convictions.

The People concede defendant was subjected to interrogation without first being advised of his *Miranda* rights—no *Miranda* warning was given until mid-interrogation and postconfession; as such, the People agree defendant's prewarning statements and confession were inadmissible. Nevertheless, the People maintain the mid-interrogation

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

*Miranda* warning was followed by a valid waiver of rights, there was no unequivocal invocation of the right to counsel, and defendant's subsequent statements were admissible. As for defendant's claim he invoked his right to silence at the outset, the People maintain defendant waived that right when he "reinitiated" discussion of what happened before he was asked an interrogative question.

In response, defendant agrees the unwarned interview statements should have been suppressed because they were obtained during interrogation. Defendant refutes, however, that the mid-interrogation warning was effective. He argues the untimely, postconfession *Miranda* warning did not provide a curative instruction that his unwarned statements were inadmissible. Without such a curative measure, defendant contends the untimely warning amounted to coercive conduct and rendered the postwarning statements unintelligent and involuntary. Finally, defendant reiterates that his concerns and questions about the need for counsel were an invocation of his right and did not constitute a waiver.

We accept the People's concession the prewarning statements were inadmissible because they were obtained during unwarned interrogation: it is true the detective asked interrogative questions after defendant said he wanted to talk about what happened and before a *Miranda* warning was given. Yet, the People's concession involves a tandem assertion that *no* interrogative question was posed until *after* defendant announced he wanted to talk about what happened. Thus, according to the People, even assuming defendant invoked his right to silence at the outset, there was no failure by the detective to honor defendant's invocation. Specifically, because no interrogative question was asked until defendant announced he wanted to talk about what happened, the People maintain it was defendant who initiated further conversation relevant to the investigation that constituted a waiver of any right invoked. That argument, however, does not obviate the issue of whether a "reinitiat[ion]" by defendant could constitute a valid waiver of the right to silence in the absence of any prior *Miranda* warning. Moreover, we disagree

3.

with the premise no interrogative question was asked until *after* defendant said he wanted to talk. The record does not reasonably support the People's assertion in this regard, and it has the effect of sidestepping the invocation issue.

Defendant invoked his right to silence and to cut off questioning *five times* at the beginning of the interview, but the detective continued questioning, which constituted interrogation, *before* defendant said he wanted to talk about what happened. In other words, defendant decided to talk about what happened *during* impermissible postinvocation interrogation. All of defendant's postinvocation statements *and* the attempt to extract a waiver from defendant mid-interrogation were the direct product of the detective's failure to honor defendant's invocation of his *Miranda* rights, and suppression of the entire interrogation, not just the unwarned portion, was required.

Even beyond the invocation issue, though, additional violations plagued the mid-interrogation *Miranda* warning and the purported waiver, dooming the admissibility of defendant's postwarning statements. Upon being advised of his *Miranda* rights, defendant expressed concern and uncertainty about his need for counsel in light of his prior confession. Nonetheless, the interrogation persisted without any pause, clarification, or curative explanation about the admissibility of the prior unwarned confession. Defendant's unclarified statement "I don't know" in response to a postconfession, mid-interrogation *Miranda* advisement permits no reasonable construction as a knowing and intelligent waiver.

Finally, pursuant to *Missouri v. Seibert* (2004) 542 U.S. 600 (*Seibert*), the mid-interrogation *Miranda* warning was deliberately delayed in a calculated manner that fundamentally and fatally undermined its effectiveness. By itself, the legally ineffective warning precludes admission of the postwarning statements, but it also cements the invalidity of any purported waiver—one cannot knowingly and intelligently waive rights that were not effectively explained.

4.

Considered individually and in conjunction, these *Miranda* violations compelled suppression of defendant's interrogation statements and we are constrained to reverse the trial court's judgment. Defendant made extensive statements confessing to both crimes, and considering those confessions in light of the other trial evidence, we cannot conclude the admission of the interrogation video was harmless. Given this determination, defendant's remaining claims of error are moot and we do not address them.

## FACTUAL SUMMARY

### I. Emergency Call and Investigation

Around 10:30 a.m. on September 25, 2017, a call was placed for an ambulance to respond to an address in Big Oak Flat in Tuolumne County. Tuolumne County Sheriff's Deputy Michael O'Brien was dispatched and was informed en-route that someone had been shot and was possibly deceased in a shed or trailer on the property. The property was roughly an acre of land with no houses, but included several trailers, sheds, vehicles and dirt bikes.

At the property, O'Brien encountered Bonnie P. who told him she had been held "hostage" that morning and saw her friend, Mark DeJong, get shot by someone she identified as Elton, whom she was able to physically describe. She said DeJong had been shot in a trailer or a shed on the property.

O'Brien placed Bonnie in the back of his squad car and a few moments later other deputies began to arrive. Deputies coordinated a search of the property, which turned up a woman named D.N., who was living in a trailer.

Deputy Robert Speers entered a shed where they thought the victim might be located and a search revealed the body of a man who was lying down with a blanket over his head and shoulders. Speers saw that blood had pooled underneath the body, and he ascertained the victim, later identified as DeJong, was dead.

Detective Newman arrived at the scene around noon to inspect the victim's body and the trailer where the victim had been living. He was notified Bonnie was a witness,

5.

and he interviewed her at approximately 2:00 p.m. that afternoon, which was audio and videotaped. The sheriff's department put out an alert to every agency in the state that they were looking for defendant, and deputies canvassed the area and a neighbor's house.

## II. Defendant Arrested and Interviewed

By 7:00 a.m. the next morning, a search crew located a handgun in the bushes along a trail where Bonnie indicated it had been dumped after the shooting. That afternoon around 2:00 p.m., Deputy Gregory Rogers was parked at a convenience store across from the victim's property and talking to Detective Newman by phone when Rogers saw a man walk by his car who matched the suspect's description, later identified as defendant. Rogers told Newman, "'I think I got your guy,'" and hung up. He found defendant at the back of the building crawling out of a cubbyhole. Defendant told Rogers he knew this was going to happen, but he had gotten thirsty. He added that whatever Bonnie had told the store clerk was not true. Defendant was arrested and taken to the sheriff's department investigations office.

Around 4:00 p.m. that afternoon, Newman interviewed defendant, who confessed he had shot DeJong twice in the head. He explained he had come from Florida and ended up living in a recreational vehicle that DeJong allowed him to park on DeJong's property. In exchange, defendant agreed with DeJong that he would watch the property so that no one would trespass and steal anything. Defendant also started working for a man named Dennis N. doing home remodeling.

According to defendant, DeJong was constantly making demands on him to help with a number of menial projects such as looking for various objects or fetching tools. Defendant indicated both he and DeJong smoked crystal methamphetamine, sometimes together. At first, the methamphetamine kept defendant awake for three days, but he thought it would interfere with his ability to work for Dennis N., so he stopped smoking as much. There was also another woman named D.N. living on the property who heard "spirits talking to her" and who would scream out to tell the spirits to leave her alone.

6.

Bonnie had come to live on the property recently, and she and defendant had started a sexual relationship the first night she was there. During their first sexual interlude, DeJong interrupted them by banging on the door of the trailer they were in, looking for defendant. Defendant was unsure whether DeJong interrupted on purpose or it was just bad timing. He also noted the rats and mice at the property were driving him crazy and he thought he had become paranoid because of the methamphetamine; along with D.N.'s screaming, he felt this combination of variables was a recipe for disaster.

Defendant described being irritated because DeJong was always running him around like his "lackey," and the "final straw" was when DeJong yelled in his face that Bonnie did not want a relationship with defendant. Defendant was unsure whether that had come from Bonnie herself or whether DeJong was trying to come in between defendant and Bonnie.

Defendant explained he acquired a handgun from Dennis N. to protect the property and himself from trespassers. He felt animosity building up against DeJong for the way DeJong was treating him, particularly around Bonnie. The night before and the morning of the shooting, DeJong and Bonnie were together inside a shed. It was Bonnie's last night before she was required to appear for sentencing for a criminal offense for which she was going to prison, and defendant had wanted her to spend the night with him. Defendant had asked Bonnie if she would spend it with him, but DeJong had yelled in defendant's face to "'leave her the fuck alone,'" which defendant thought was terrible in light of how he had helped DeJong. Defendant was awake all night listening to the rats; early in the morning, he went outside to get some coffee with the handgun in the pocket of his coat.

When defendant stepped outside, he heard D.N. start screaming and yelling things out such as "'You slut, ah, you whore, you're not even pretty,'" to which defendant thought he heard DeJong shout back to D.N., "'I'm in here eating her pussy.'" Defendant thought DeJong was referring to Bonnie. This upset defendant because DeJong knew

7.

defendant had feelings for Bonnie, and DeJong had a wife or girlfriend already. DeJong also knew defendant had wanted to spend that last night with Bonnie, and it was "too much to take with everything." Defendant did not do anything immediately, but he was not going to let DeJong get away with it. He told Detective Newman, "It just, ah, and then hearing that, I just gave up. I gave up on life, I'm standing here with a—a handgun. He does this to me. And it was just strong emotions of, ah, her and—and him and not sleeping. I just didn't care. I didn't care at all. And I just did it. I didn't care what— what happened. I didn't care. And I took it, yep. For once I took what I wanted." Defendant described waiting for a while for DeJong to exit the shed, but it was taking too long, so defendant went into the shed and shot DeJong twice in the head. Defendant then put a blanket over him; defendant did not want to see the body nor did he want Bonnie to see it as she was standing behind DeJong when defendant shot him.

Defendant told Bonnie he would never hurt her, and took her back to his room/trailer. He did not plan to proposition her for sex because it "would have been just rape" as "she was uncomfortable the whole time 'cause I was holding her hostage." During their time in the trailer, defendant looked out the window and thought he heard heavy machinery and that the shed where DeJong was shot had been torn down. He mentioned this to Bonnie, but she said the shed was still there—which defendant thought probably added to Bonnie thinking he was crazy. Defendant thought this resulted from having no sleep and being on methamphetamine.

After a while, he and Bonnie walked on a trail from the property to a convenience store that was close by to get something to drink. Defendant threw the handgun in the bushes, telling Bonnie if she went into the store and told the person at the register what happened he would completely understand, but if not to get him something to drink and come back. Bonnie went into the convenience store, and when defendant realized she was not coming back, he went back to DeJong's trailer and drank a beer. Defendant changed into different clothes so that he would not fit any description Bonnie might give

8.

of him. He ended up leaving his cell phone in DeJong's trailer. He stayed around the outskirts of the property all night, slept for a few hours in a cubbyhole near an RV, and then went back to the convenience store the next day looking for water, where he was arrested.

Based on an autopsy, a coroner confirmed DeJong had died from gunshot wounds to the head, and the gun was likely two feet or less away from DeJong when it was fired. Defendant was charged with first degree murder and kidnapping. Prior to trial, defendant filed a motion to suppress his interview with Newman, but the motion was denied and a video of the complete interview was played for the jury.

## III.   Bonnie's Trial Testimony

Bonnie testified at trial that she had been DeJong's friend for about a year and a half before the shooting, and she had been staying on the property since the end of August 2017 to help DeJong get his towing business started. Defendant, whom Bonnie met when she moved in, was living there to keep people out when DeJong was gone or during the night. She started a sexual relationship with defendant within a week of her arrival, and defendant then started following her around and acting possessive when she talked to anyone. He wanted a relationship with her, and she thought it was upsetting him that she did not share a desire for any type of long-term relationship.

Defendant showed signs of jealousy about Bonnie's friendship with DeJong and Justin, another friend of Bonnie's and DeJong's. Defendant would accuse Bonnie that something was going on between her and Justin, which Bonnie denied. Defendant also implicitly hinted that Bonnie was having a romantic relationship with DeJong. DeJong could see defendant was becoming more possessive about Bonnie, and began telling defendant to leave Bonnie alone and gave defendant additional things to do. Bonnie acknowledged DeJong had sometimes talked to defendant in a rude manner, but that was not a daily occurrence and she only saw it happen a couple of times.

9.

Defendant had been staying in a trailer behind the shed where DeJong was shot. The day before the shooting, Bonnie and defendant had hung out in that shed or in defendant's trailer; they had both smoked methamphetamine and marijuana throughout the day while in defendant's trailer, which had been an everyday occurrence—DeJong was not with them, he was either in the shed or in the driveway painting his car.

That day, defendant showed Bonnie a small gun he had obtained from Dennis, which Bonnie insisted defendant show to DeJong. At a time later when Bonnie was helping DeJong in the shed, defendant presented the gun to DeJong, who was happy defendant would be able to defend the property better.

Later that evening, Bonnie and DeJong were still in the shed together—Bonnie was untangling cords and wires, and DeJong was chatting with Bonnie while shopping on his phone for the security system he planned to install on the property. Throughout the night, DeJong was coming and going from the shed, working on his car. Defendant kept stopping by to ask Bonnie to spend the night with him in his trailer because he knew it was her last night on the property, and DeJong kept telling him to leave. Bonnie was scheduled to be sentenced in a pending criminal case the next morning and would not be coming back.

By the early morning hours, DeJong had stopped going in and out and had been in the shed with Bonnie for several hours. D.N. was staying in a trailer behind the shed and next to defendant's trailer—she had mental problems and was always yelling things out. Bonnie and DeJong began hearing D.N. yelling, and DeJong yelled back for her to shut up or he would "'punch [her] in [her] p-u-s-s-y.'" Bonnie thought defendant was in his trailer at that time, and a few minutes after DeJong yelled at D.N., the shed door opened. From the corner of her eye, Bonnie saw DeJong stand up and say something to the effect of, "'What, you're just going to walk in, you're not even going to knock?'" Right at that second, Bonnie looked over to where DeJong was standing and she saw defendant shoot

10.

DeJong in the face, pulling the trigger twice. Defendant then picked up a blanket on the floor, wiped the blood off his feet and legs, and told Bonnie to come with him.

Not knowing his plans, Bonnie asked defendant not to hurt her. Defendant opened the shed door, beckoning Bonnie to walk out in front of him. She started to walk out, stepping over DeJong's body, and surreptitiously grabbed DeJong's cell phone because she did not have one that worked and hid it in her pants.

Defendant told Bonnie not to run because he did not want to hurt her. He directed her to the back room of his trailer, locking the door to the trailer from the inside. He began telling her that he was angry Bonnie had refused to spend the night with him, he thought Bonnie and DeJong were doing something in the shed, and when DeJong had yelled at D.N., defendant thought DeJong had shouted that he was "eating" Bonnie's "'p-u-s-s-y.'"

Defendant held Bonnie in the trailer for three hours, constantly talking about why he shot DeJong. He also talked about showing D.N. the gun so her prints would be on it. He said he knew he was going to prison for a long time, and he gave Bonnie all the money in his wallet, telling her the police were going to take it from him anyway. He also talked about suicide and noted there were four bullets in the gun and he thought he could kill Bonnie and then himself. Defendant had a moment when he thought the police had already arrived, had started a forklift and were demolishing the shed, but that was not true. Bonnie told him to look at the shed and see that it was still standing, which he did.

Later, he told her he was thirsty and wanted to go to the nearby convenience store, but he did not want to tie her up and leave her there alone. Bonnie was able to convince defendant to go to the store together. He indicated he was going to have the gun the whole time, and if she did not try something stupid, he would get rid of it on the way back.

The convenience store was about a half-block away via a trail from the property. As they were walking the trail, defendant was telling Bonnie not to run in front of him.

11.

Bonnie claimed to need a bathroom, so he gave her money to get something to drink. When she started walking toward the store, he called out to get her attention—Bonnie turned around and saw defendant throw the gun in the blackberry bushes.

When Bonnie saw defendant throw the gun, she went into the store—she had no idea if he was trying to recover the gun. Once inside the store, she went into a bathroom and called a friend. She told him DeJong had been shot and killed by defendant, and asked the friend to pick her up. She then bought two sodas, and walked to a neighbor's house. She returned to DeJong's property, and located officers on the scene to tell them what had occurred. She gave the officer she spoke with DeJong's phone and keys, and told the officer she knew where defendant had thrown the gun.

## IV. Other Testimony

Dennis N. testified defendant had been doing some work for him at his construction business, and defendant had told Dennis he was living on DeJong's property. About 10 days before the shooting, defendant had asked Dennis for a gun because there were people roaming around the property, and defendant felt his life was threatened. Dennis loaned him a .25-caliber handgun that he had purchased for his wife years before. When he gave defendant the gun, he believed it had a six-round clip in it. Upon viewing a photo of the gun recovered from the bushes, he thought it looked like the gun he had loaned defendant.

## V. Defendant Convicted and Sentenced

Defendant did not testify or present any other evidence at trial. The jury convicted defendant of first degree murder and kidnapping, and found true the enhancement allegation defendant had personally and intentionally used a firearm within the meaning of section 12022.53, subdivisions (b) and (d), as to the murder and kidnapping counts.

Defendant was sentenced to a determinate upper term of eight years for kidnapping, plus an additional consecutive term of 10 years for the firearm enhancement under section 12022.53, subdivision (b); the court also imposed a consecutive

12.

indeterminate term of 25 years to life for the first degree murder conviction, plus an additional and consecutive term of 25 years to life for the firearm enhancement under section 12022.53, subdivision (d). This appeal followed.

**DISCUSSION**

**I.      Multiple *Miranda* Violations Required Suppression of Defendant's Interrogation Statements**

Defendant maintains there were multiple *Miranda* violations that required suppression of his interrogation statements. He argues he invoked his right to silence immediately, which was not honored by Newman, *Miranda* warnings were not given timely, and, when the *Miranda* warning was given, defendant invoked his right to counsel.

The People concede interrogation occurred before a *Miranda* warning was given, and the unwarned portion of the interrogation should have been suppressed. Once the *Miranda* warning was given, however, the People maintain defendant provided a valid waiver of rights and his postwarning statements were all admissible. The People frame defendant's argument about invoking counsel when the *Miranda* warning was given as one related to waiver: that defendant did not waive his rights because he invoked his right to counsel. The People argue defendant is wrong in both regards because defendant knowingly, intelligently and voluntarily waived his right to counsel and his question and uncertainty about the need for counsel was not an unequivocal invocation.

We conclude the failure to honor defendant's invocation of the right to silence rendered the entire interrogation inadmissible. Beyond that, when a *Miranda* warning was finally given, we agree with the People that defendant's expressed uncertainty about counsel presents an issue of whether defendant knowingly and intelligently waived his right to counsel. The timing and circumstances of the postconfession, mid-interrogation *Miranda* warning leaves no reasonable path to construe the words "I don't know," defendant's uncertain and unclarified response to the advisement of the right to counsel,

13.

as a knowing and intelligent waiver of the right. Because the waiver was invalid, we need not reach the separate issue of whether defendant's question and concern about counsel constituted an invocation of that right. Finally, the mid-interrogation *Miranda* warning was legally ineffective under *Seibert*, which inescapably doomed the admissibility of defendant's postwarning statements and further eviscerated the validity of any purported waiver.

## A. Background

### 1. Interrogation of Defendant

After arresting defendant, he was taken to the county sheriff's investigations unit and placed in an interview room. Newman introduced himself to defendant and asked if defendant wanted the handcuffs removed. As they discussed the handcuff removal, defendant stated at the very outset of the interview he did not want to talk about anything with Newman—*five times*.

> "[Newman]: You're not gonna try anything crazy on me?
>
> "[Defendant]: Mm-mm
>
> "[Newman]: Cool. All right.
>
> "[Defendant]: ***But I'd rather not talk about anything today***.
>
> "[Newman]: Well, I just wanna ask you a few questions. I've gotta know a little bit more about who you are. So can you stand up for me? I'd like to get those handcuffs off for you, make you a little more comfortable. Okay, when I get this off put that hand on top of your head. Okay. Go ahead and relax, sit down. Drink some water. Long day?
>
> "[Defendant]: It's like a Barbara Walters TV show.
>
> "[Newman]: It's like a Barbara Walters TV show?
>
> "[Defendant]: Yeah, when people get in here they start crying and they got the tissues right there.
>
> "[Newman]: Well.

14.

"[Defendant]: *Yeah. Ah, shit. I don't wanna talk about it.*

"[Newman]: Okay. Can I at least get your information? We have an idea of who you are but I'd like to make sure that we're correct. So what's your first name?

"[Defendant]: *I don't really wanna talk about it.*

"[Newman]: Well, I just need to get your name and stuff.

"[Defendant]: Yeah.

"[Newman]: We can, let's just start with that.

"[Defendant]: *No, all I wanna do is commit suicide as soon as I can.*

"[Newman]: Okay, well, I'm not gonna let you do that here 'cause that's not gonna help anybody. All right, how about if I ask you if what information we have is correct? Is your name Elton?

"[Defendant]: Yeah.

"[Newman]: Is that a yes?

"[Defendant]: Yes, it is. I don't even care.

"[Newman]: And your—your last name is…

"[Defendant]: (Unintelligible).

"[Newman]: What's that?

"[Defendant]: *I'd rather not talk about anything*…

"[Newman]: Well, I, like I said, I just need to get your information. I need at least your name, okay?

"[Defendant]: You already have it.

"[Newman]: Elton Redick, is that correct?

"[Defendant]: Yeah, Elton Redick." (Italics and boldface added.)

Newman then asked for the spelling of defendant's last name, where he was originally from, his current address, his phone number, whether he had a cell phone, what

15.

had happened to it, and the color and make of the cell phone. This was significant to the investigation, as discussed *post*, because cell phones were located during a search of the property and officers were trying to determine which phone might belong to defendant.

Newman asked how long defendant had been living at DeJong's property, how much education defendant had received, and why defendant's mother had not required defendant to go to school after fifth grade. Upon indicating he never earned a high school diploma or GED, defendant said he would "rather just talk about what happened and then, ah, that's it. I gotta blow my nose." Newman told him to "[g]o for it."

Defendant described how he ended up working for Dennis, how he met DeJong and started living on DeJong's property, and his relationship with Bonnie. In explaining that DeJong was treating him poorly and coming between defendant and Bonnie, he indicated the following:

> "And, ah, [DeJong] was just being a complete asshole. And I did shoot him, it was me. I got the, um, the handgun for protecting the property. And, ah, I was staying up, that night I did do some crystal meth, I shouldn't have been doing it at all, you know? I should have been working with (Dennis) remodeling homes. Shit. It all went to shit. Oh God, I should have got out of there. []Dennis[, h]e was a cool boss. He said, ah, he was gonna give me, ah, one of the homes that, ah, he's remodeling…"

Newman commented he thought Dennis really seemed to like defendant and that he was "pretty surprised by all this." Defendant continued to talk about how DeJong seemed to be influencing Bonnie to think less of defendant and that DeJong treated defendant poorly.

About 25 minutes into the interview, defendant noted that his mouth was getting dry and that he just wanted to hang himself on a tree; Newman interrupted and explained to defendant that he had the right to remain silent and the right to an attorney:

> "[Newman]: Well, Elton, I'd like to ask you a little bit more about this, is that all right? But before I do, you know, I wanna make sure that you understand all the things that you need to understand, okay? So you know, obviously, you've been arrested. You're here, you got put in

16.

handcuffs and we need to discuss this a little bit more.  But you do, you need to understand that you have a right to remain silent.  And anything you can—you say may be used in court against you.  You also…

"[Defendant]:  I'm…

"[Newman]:  …have the—huh?

"[Defendant]:  I'm just I know this is being recorded, I'm just telling you exactly what happened.

"[Newman]:  And that's—that's what I need to hear.  Okay, you also have the right to the presence—presence of an attorney during these questions and if you can't afford one, one will be given to you free of charge.  Do you understand all that?  Okay, so I, once again…

"[Defendant]:  *And—and all of this really, I—I guess, I don't know, all—all of it coming out, it should have been with, ah, my attorney here because the attorney is, ah, gonna be presenting the case, right?*

"[Newman]:  No, not necessarily, I mean, the, you know, you don't necessarily have to have an attorney during, it's—it's your option.  You know, but…

"[Defendant]:  *I don't even, honestly, but…*

"[Newman]:  What's that?

"[Defendant]:  *I don't … even know if I should, I don't know.*

"[Newman]:  Okay, well I just had a few questions because I've already talked to (Bonnie) and I've talked to (Dennis), okay?  (Dennis) seemed really surprised about all this.  He—he thought there was, um, other guy named, ah, (Justin).

"[Defendant]:  Yeah."  (Italics and boldface added.)

Defendant then continued answering Newman's questions, and the interrogation continued for approximately another 90 minutes, reviewing all the details before, during and after the shooting.

17.

## 2.     Suppression Hearing

Prior to trial, defendant filed a motion to suppress his confession on the ground it was taken in violation of *Miranda*.  In the written motion, trial counsel argued defendant was unmistakably in custody when he was interviewed, and he was interrogated without ever having been given a *Miranda* warning.  Only after defendant made inculpatory statements was a *Miranda* warning given, and it was not clear defendant understood that warning or agreed to waive his rights.

The prosecution filed a brief in response and argued that advising defendant of his *Miranda* rights was unnecessary during the initial portion of the interview because Newman was asking defendant about simple biographical and booking information.  Newman was not trying to elicit an incriminating response and, thus, there was no interrogation prior to a *Miranda* warning being given.  Moreover, defendant's statements were all voluntary—there was no coercion.[2]

The parties presented argument at a suppression hearing.  Defense counsel asserted defendant had invoked his right to silence at the outset of the interview, which was not honored.  The questioning went on, and finally a *Miranda* warning was given, but defendant expressed confusion about whether he should have an attorney, which was an invocation of that right.  The prosecutor argued defendant never clearly invoked his right to silence and, even if he had, he could not do so before the interrogation began.  Further, questioning whether he needed an attorney was not a clear invocation of his right to counsel.  Defendant understood his rights, waived them, and then made a voluntary confession.

The trial court determined the nature of Newman's prewarning questions was to elicit biographical information, not to obtain incriminating responses.  With respect to

---

[2]     On appeal, the People concede interrogation occurred before a *Miranda* warning was given and that the prosecutor's argument was incorrect in this regard.

18.

defendant's invocation of the right to silence, the court reasoned that Newman's questions had not been designed to elicit incriminating statements; thus, any invocation did not occur during a custodial interrogation.

The court explained further:

> "And I don't think it was necessary to give the *Miranda* warnings under the circumstances because he was not conducting an investigation to elicit incriminating responses from [defendant]. His statements, even though he said, 'I don't want to talk about it,' perhaps if they were being— if he were asking questions designed to elicit incriminating statements, that might be a sufficient invocation of *Miranda*, but I don't see it under the circumstances presented in this—in the video that I saw.

> "The next question is, of course, [defendant] gives his statement, and at that point it's clear that Detective Newman needs to ask further questions and to get some details about the statements that [defendant] has made. And then the question about his attorney comes up. And I wrote down the quote, it's in—I think you quoted it already, [defense counsel], but [defendant] says, 'And all of this really, I—I guess, I don't know, all—all of it is coming out, it should have been with my attorney here because the attorney is gonna be presenting the case, right?'

> "And Detective Newman says, 'Not necessarily, you know, you don't necessarily have to have an attorney during, it's your option. You know, but'—and [defendant] says, 'I don't even, honestly, but,' not finishing that statement, and … Detective Newman says, 'What's that?' And [defendant] says, 'I don't even know if I should, I don't know.'

> "So the question then is, is that an invocation of his *Miranda* rights at that point? And it's clear the law requires an unambiguous invocation of the *Miranda* rights. There are cases that—where the defendant has made statements like, 'Maybe I should talk to a lawyer,' or, 'Should I have somebody here talking with me, is this the way it's supposed to be done?' Those kinds of statements were found to be ambiguous and not sufficient to be an unambiguous invocation to a right to a lawyer or right to remain silent.

> "So I don't think that it was an invocation of *Miranda* based on the statement that [defendant] made after he was advised of his *Miranda* rights.

> "So given the totality of the circumstances, I'm going to find there was no *Miranda* violations, either at the time of the initial statement or after

19.

he mentioned the possibility of a lawyer; so my ruling is that the motion to suppress the confession is denied." Italics added.)

## B. Standard of Review

"In reviewing the trial court's ruling on a claimed *Miranda* violation, '"we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence. We independently determine from [those facts] whether the challenged statement was illegally obtained."'" (*People v. Elizalde* (2015) 61 Cal.4th 523, 530.) Further, "[we] apply federal standards in reviewing defendant's claim that the challenged statements were elicited from him in violation of *Miranda*." (*People v. Bradford* (1997) 14 Cal.4th 1005, 1033.)

## C. Governing Law

"The due process clause of the Fourteenth Amendment to the United States Constitution bars the admission of 'any involuntary statement obtained by a law enforcement officer from a criminal suspect by coercion.' (*People v. Neal* (2003) 31 Cal.4th 63, 79 .…).) So when the police obtain a suspect's statements 'by "techniques and methods offensive to due process …" … or under circumstances in which the suspect clearly had no opportunity to exercise "a free and unconstrained will,"' the statements are inadmissible. (*Oregon v. Elstad* (1985) 470 U.S. 298, 304 (*Elstad*), citation omitted, quoting *Haynes v. Washington* (1963) 373 U.S. 503, 515, 514.)" (*People v. Mendez* (2019) 7 Cal.5th 680, 698.)

In *Miranda*, the United States Supreme Court established procedural admonitions as a prophylactic measure to protect a suspect's right against self-incrimination under the Fifth Amendment. (*Miranda*, *supra*, 384 U.S. at p. 444.) The court held "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." (*Ibid.*)

The rule of *Miranda* requires that before police may question a suspect during a custodial interrogation, the suspect must be advised of the right to remain silent and to an attorney and that any statements may be used against him or her in court. (*Miranda*, *supra*, 384 U.S. at p. 479.) "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." (*Id.* at pp. 473–474; accord, *People v. Davis* (2009) 46 Cal.4th 539, 585; see *Dickerson v. United States* (2000) 530 U.S. 428, 435–443.)

A suspect "need not 'speak with the discrimination of an Oxford don'" to invoke his Fifth Amendment rights (*Davis v. United States* (1994) 512 U.S. 452, 459), and "no ritualistic formula or talismanic phrase is essential in order to invoke" those rights (*Emspak v. United States* (1955) 349 U.S. 190, 194). When a suspect has exercised his or her option to terminate questioning, officers may not persist "in repeated efforts to wear down [the suspect's] resistance and make him change his mind." (*Michigan v. Mosley* (1975) 423 U.S. 96, 105–106 (*Mosley*).) "[T]he admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'" (*Id.* at p. 104.)

No formal recitation of the *Miranda* admonition is required before a suspect may invoke his or her *Miranda* rights. Rather, a suspect may invoke *Miranda*'s protections if custodial interrogation is impending or imminent. (*People v. Nguyen* (2005) 132 Cal.App.4th 350, 357; see *United States v. LaGrone* (7th Cir. 1994) 43 F.3d 332, 339; *United States v. Grimes* (11th Cir. 1998) 142 F.3d 1342, 1348; *United States v. Abdallah* (4th Cir. 2018) 911 F.3d 201, 212.)

A "custodial interrogation" occurs whenever law enforcement officers initiate questioning after a person has been taken into custody or otherwise deprived the suspect's freedom of action in any significant way. (*Miranda*, *supra*, 384 U.S. at p. 444.) Under *Miranda*, "'interrogation'" refers not only to express questioning, but also to the "functional equivalent" of express questioning. (*Rhode Island v. Innis* (1980) 446 U.S.

291, 300–301 (*Innis*).)  This encompasses "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."  (*Ibid.*, fn. omitted.)

Thus, under what has been recognized as a booking exception, no *Miranda* warnings need to be given prior to police communications that are "'normally attendant to arrest and custody[].'"  (*Pennsylvania v. Muniz* (1990) 496 U.S. 582, 600 (*Muniz*).)  This includes communications associated with police administrative duties that are distinct from investigatory duties and encompass inquiries concerning biographical information.  (*Id.* at pp. 601–602.)  However, "[w]hen booking questions go beyond the basic biographical data contemplated in *Muniz*, the core concerns of *Miranda* and *Innis* are implicated.  The high court has recognized that broader questioning during the booking process may elicit incriminating responses depending on the circumstances."  (*People v. Elizalde*, *supra*, 61 Cal.4th at p. 536.)

Accordingly, a suspect's invocation of *Miranda* rights does not prohibit officers from speaking to that person about anything at all—the prohibition extends to asking any questions police should know are reasonably likely to elicit incriminating information in the specific circumstances of the case.  (See *Innis*, *supra*, 446 U.S. at p. 301; *Mosley*, *supra*, 423 U.S. at pp. 102–103, fn. omitted [no passage in *Miranda* "can sensibly be read to create a *per se* proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent"].)  Booking questions, whether asked before or after *Miranda* rights are invoked, are not impermissible because they do not constitute interrogation.  (*Muniz*, *supra*, 496 U.S. at pp. 600–602.)

*Miranda* rights can be waived both initially and after invoking them, but the prosecution has the burden of establishing the waiver was knowing and voluntary.  (*North Carolina v. Butler* (1979) 441 U.S. 369, 372–373.)  The waiver must be

22.

"'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception,' and 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" (*Berghuis v. Thompkins* (2010) 560 U.S. 370, 382–383.) A waiver can be established even absent formal or express statements: a *Miranda* waiver "may be implied through 'the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver.'" (*Id.* at p. 384.)

If the accused initiates further communication after invoking his rights, officers may reopen an interrogation upon a knowing and intelligent waiver. "An accused 'initiates' such dialogue when he speaks words or engages in conduct that can be 'fairly said to represent a desire' on his part 'to open up a more generalized discussion relating directly or indirectly to the investigation,'" and "the police may commence interrogation if he validly waives his [*Miranda*] rights." (*People v. Mickey* (1991) 54 Cal.3d 612, 648, 649; accord, *Edwards v. Arizona* (1981) 451 U.S. 477, 486–487; *Oregon v. Bradshaw* (1983) 462 U.S. 1039, 1046 (plur. opn. of Rehnquist, J.) (*Bradshaw*).)

### D. Defendant's Invocation of the Right to Silence Was Not Honored

Defendant maintains he invoked his right to silence immediately, but Newman continued the interrogation in violation of *Miranda*. The People concede Newman asked questions during the unwarned portion of the interview that constituted interrogation and assert that this portion of the interview should have been suppressed. The People contend, however, that defendant's invocation of the right to silence is irrelevant because, in the People's view, no interrogation occurred until *after* defendant waived his rights by "reinitiat[ing]" conversation about the investigation with Newman. The record does not support the People's argument.

There is no dispute defendant was in custody when interviewed, and the facts confirm it: at the time of the interview, defendant had been arrested, handcuffed, taken to

23.

the county sheriff's investigation office, and placed in an interview room. (*Miranda*, *supra*, 384 U.S. at p. 444.)

At the very outset of the interview, defendant unambiguously invoked his right to silence and to cut off questioning. Defendant plainly told Newman he did not want to talk about anything—five times. Other than expressly referencing *Miranda* or the Fifth Amendment, it is hard to envision a clearer statement from defendant that he did not want to be questioned.

We reject the People's suggestion defendant's invocation was invalid as anticipatory of interrogation that had not yet begun. A suspect may invoke *Miranda*'s protections if custodial interrogation is impending or imminent. (See, e.g., *People v. Nguyen*, *supra*, 132 Cal.App.4th at p. 357.) Interrogation was certainly imminent when the interview began. The timing and circumstances of defendant's invocation is plainly distinguishable from that in *McNeil v. Wisconsin* (1991) 501 U.S. 171, where the court rejected the defendant's claim he anticipatorily invoked his right to counsel in a court proceeding days before police even attempted to conduct another interview. (*Id.* at pp. 173–175.)

Newman was the lead detective in the case, he had already been to the property to investigate, and had conducted an extensive interview the prior day with Bonnie—an eyewitness to the murder who knew defendant and identified him as the shooter. Law enforcement had been searching for defendant for over 24 hours before he was arrested, and the investigation had already uncovered the gun Bonnie told police defendant had thrown into the bushes along the trail to the store. Prior to the interview, Newman was positioned to be highly confident defendant was the shooter, and custodial interrogation was imminent the moment Newman introduced himself as a detective and told defendant he would "like to talk to [him] today." There was no more apt time for defendant to invoke his right to silence than when, handcuffed in an interview room in an

24.

investigations unit of the sheriff's department following his arrest, he was told by a plainclothes detective that he wanted to talk.

After telling Newman he did not want to talk, interrogation should have ceased, but that is not what happened. Newman pivoted to what are generally considered routine booking questions regarding defendant's name, birthdate, and current address. It was not impermissible to ask booking questions at that point, but the questions were not limited to booking matters. (*People v. Shamblin* (2015) 236 Cal.App.4th 1, 22 ["The routine booking question exception applies 'even when a defendant has already received *Miranda* warnings and invoked his or her rights.'"].)

Quickly after obtaining some routine biographical details, Newman turned to questions reasonably likely to elicit an incriminating response by asking about defendant's cell phone, including particular questions about where defendant had left it and what it looked like. Newman returned to these questions later in the postwarning portion of the interrogation, indicating officers had found cell phones in one of the trailers at the front of the property and were trying to determine if they belonged to defendant. That cell phone was part of the evidence linking defendant to the crime scene and perhaps the shooting—the fact Newman was asking about it initially was not a matter of booking, but an issue of interest in the investigation about which Newman was fully aware.

After defendant invoked his right to silence and to cut off the interview, Newman pursued a line of questioning that wove together rapport-building or booking questions with questions directly related to the investigation and likely to elicit incriminating responses. (*Innis*, *supra*, 446 U.S. at p. 301, fn. omitted ["A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect … amounts to interrogation."].) The right invoked was not scrupulously honored: the detective was not entitled to continue interrogation after invocation to see if defendant would answer questions or discuss issues relevant to the investigation. (*Mosely*, *supra*,

25.

423 U.S. at pp. 105–106.)  Suppression of defendant's statements after his invocation was required.  (*Id*. at p. 104 [admissibility of statements obtained after invoking right to silence depends on whether right to cut off questioning was scrupulously honored]; see *People v. Peracchi* (2001) 86 Cal.App.4th 353, 362 [finding confession should have been suppressed because "[d]espite [the defendant's] invocation of his right to remain silent, the officer persisted in asking him questions regarding why he did not wish to speak with the officers at that time without even a momentary cessation in questioning"].)

The People do not concede defendant invoked his right to silence when he told Newman five separate times he did not want to talk.  But, they argue, even assuming there was an invocation, it was essentially irrelevant because nothing constituting interrogation occurred until *after* defendant said he was willing to talk; thus, any invocation of the right to silence was honored until defendant himself waived that right.  We disagree for two reasons.  First, the detective had already exceeded the bounds of the booking exception before defendant decided to "talk about what happened"; the failure to honor defendant's invocation came *before* defendant decided to discuss what had occurred at the property.  Moreover, because the interrogation never ceased or even paused despite defendant's invocation, it was impossible for defendant to "reinitiate[]" discussion relevant to the investigation.  He could not reinitiate what was already occurring.

Second, a suspect cannot knowingly and intelligently waive rights of which he has never been advised.  When the accused initiates a conversation related to the investigation after invoking his *Miranda* rights, "where reinterrogation follows, the burden remains upon the prosecution to show that subsequent events indicated a waiver of … Fifth Amendment right[s]."  (*Bradshaw*, *supra*, 462 U.S. at p. 1044; accord, *People v. Molano* (2019) 7 Cal.5th 620, 661.)

When defendant said he would talk about what happened, no prior *Miranda* warnings had been given nor was there any acknowledgment by defendant that he

understood those rights. Given the interview's progression, had defendant thought he had a right to silence in the beginning when he invoked, Newman's repeated refusal to stop the questioning sent a message that defendant had no such right. Standing by itself, defendant's statement he would talk about what happened during questioning that amounted to unwarned interrogation does not establish a knowing and intelligent waiver of the right he had invoked. (*Bradshaw*, *supra*, 462 U.S. at pp. 1044–1045.)

In sum, defendant invoked his right to silence and to cut off questioning five separate times, but interrogation did not cease. Defendant could not "reinitiate[]" an already ongoing and continuing conversation relevant to the investigation. Moreover, any "reinitiat[ion]" could not constitute a valid waiver of the right to silence when no *Miranda* warning had yet been given. All defendant's statements after his invocation were the product of the failure to scrupulously honor his invocation and should have been suppressed.

### E. Defendant's Waiver of Rights Was Not Knowing and Voluntary

For purposes of the prosecution's case-in-chief, the failure to provide any *Miranda* warnings prior to interrogation precluded admission of defendant's unwarned statements, but the failure to honor defendant's invocation of the right to silence was fatal to the admissibility of the *entire* subsequent interview.[3] Yet, even setting aside the invocation issue, there is no path to salvage the warned portion of the interview either: the purported waiver of rights obtained mid-interrogation was no waiver at all. There is little to no evidence—and certainly not a preponderance—establishing any waiver was knowingly and intelligently given.

"'In order to combat [the] pressure [of custodial interrogation] and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be

---

[3] Voluntary statements obtained in violation of *Miranda* may still be used for impeachment purposes on cross-examination. (*Elstad*, *supra*, 470 U.S. at p. 307, citing *Harris v. New York* (1971) 401 U.S. 222.)

adequately and effectively apprised of his rights' to remain silent and to have the assistance of counsel. (*Miranda* [, *supra*, 384 U.S.] at p. 467.) '[I]f the accused indicates in any manner that he wishes to remain silent or to consult an attorney, interrogation must cease, and any statement obtained from him during interrogation thereafter may not be admitted against him at his trial' [citations], at least during the prosecution's case-in-chief [citations]." (*People v. Lessie* (2010) 47 Cal.4th 1152, 1162.) The validity of a *Miranda* rights waiver requires "an evaluation of the defendant's state of mind" (*People v. Williams* (2010) 49 Cal.4th 405, 428) and "'inquiry into all the circumstances surrounding the interrogation'" (*People v. Nelson* (2012) 53 Cal.4th 367, 375). To establish a valid waiver of *Miranda* rights, the prosecution must show by a preponderance of the evidence that the waiver was knowing, intelligent, and voluntary (*People v. Williams*, *supra*, at p. 425).

"'[A] suspect who desires to waive his *Miranda* rights and submit to interrogation by law enforcement authorities need not do so with any particular words or phrases. A valid waiver need not be of predetermined form, but instead must reflect that the suspect in fact knowingly and voluntarily waived the rights delineated in the *Miranda* decision. (See *North Carolina v. Butler*[, *supra*,] 441 U.S. [at p.] 373.) [The high court has] recognized that a valid waiver of *Miranda* rights may be express or implied. [Citations.] A suspect's expressed willingness to answer questions after acknowledging an understanding of his or her *Miranda* rights has itself been held sufficient to constitute an implied waiver of such rights. [Citations.] In contrast, an unambiguous request for counsel or refusal to talk bars further questioning.' [Citation.]" (*People v. Sauceda-Contreras* (2012) 55 Cal.4th 203, 218–219.)

With the threshold presumption against waiver in view (*People v. Williams*, *supra*, 49 Cal.4th at p. 425), it is difficult to overstate the negative impact of the late *Miranda* warning on defendant's ability to knowingly and intelligently waive his rights. Defendant did not receive a *Miranda* warning before he was interrogated, and he had

already confessed by the time a warning was provided. When he was advised of his right to counsel, defendant did not expressly indicate he understood, but instead asked whether he needed an attorney in light of his earlier confession.[4] This was a genuine question about the perplexing posture of the interrogation in relation to his right to an attorney. Without any clarification about the admissibility of his initial unwarned confession, advising defendant he had a right to counsel at what Newman implied was the tail end of the interrogation would have been confusing to any reasonable person and defendant was obviously uncertain.

In the face of defendant's confusion, Newman downplayed the need for an attorney, saying it was not necessary although it was defendant's option, and defendant responded again he did not "know if I should, I don't know." Without any pause or clarification whether defendant understood his rights or wanted counsel, Newman persisted with the interrogation, indicating only a "few questions" remained because he had already talked to Bonnie and Dennis. There is no basis on which to reasonably conclude the words "I don't know" constituted a knowing and intelligent waiver of the right to counsel.

The situation here contrasts sharply with *Duff*, where the court concluded a waiver was knowing, intelligent and voluntary even though the suspect had questioned the need for an attorney. (*People v. Duff* (2014) 58 Cal.4th 527 (*Duff*).) In that case, police advised a suspect of his rights and then the suspect responded, "'I don't know. Sometimes they say it's—it's better if I have a—a lawyer.'" (*Id.* at p. 552.) The interrogating officer then reiterated to the suspect it was entirely up to him whether he wanted to talk and he could stop the interview at any time to which the suspect responded, "'Okay. Okay. I understand'" (*ibid.*); the officer then asked directly whether

---

**4** While the prosecutor argued at the suppression hearing that defendant nodded in response that he understood his right to counsel, the video is difficult to discern in this regard and the trial court made no express finding whether defendant actually made that acknowledgment.

the suspect was willing to talk about issues relevant to the investigation and the suspect responded affirmatively; and finally, the officer asked whether the suspect felt "'confident with that,'" advised him to "'keep [his] rights in mind'" and if he did not feel like answering another question he should just say so, and the suspect assented a third time to speak with the officer (*id.* at pp. 552–553).

In concluding the suspect validly waived his rights, the court reasoned that even if this was an equivocal invocation and even assuming the officer was required to clarify, the interviewing officer confirmed three times whether the suspect was willing to talk and reminded the suspect that if he did not feel like answering another question, the suspect could just say no. (*Duff, supra*, 58 Cal.4th at pp. 552–554.) Here, there is nothing comparable to *Duff* that demonstrates defendant understood his right to counsel or knowingly and intelligently waived.

The People argue Newman was under no obligation to clarify an ambiguous request for counsel, but they rely on *People v. Gonzalez* (2005) 34 Cal.4th 1111, which presented a postwaiver invocation issue. (*Id.* at p. 1119 [the defendant waived his rights and then later said if police were going to charge him, he wanted to talk to a public defender, which he claimed on appeal was a postwaiver invocation].) The postwaiver rule rejecting any duty to clarify ambiguous invocations and permitting an officer to continue substantive question "'"until and unless the suspect *clearly* requests an attorney"'" is inapposite in the context of pre-*Miranda* waiver invocations of the right to counsel. (*Duff, supra*, 58 Cal.4th at p. 553.)

Newman hurried through defendant's inquiry about counsel and, unlike the officer in *Duff*, never clarified that defendant understood his rights or whether he actually wanted an attorney. While the California Supreme Court has not unequivocally required clarification in these circumstances, the fact none was sought cuts heavily against finding the waiver was knowing and intelligent, especially when defendant was advised of his right to counsel only *after* interrogation and a confession. Newman gave defendant no

30.

time to think over his decision about counsel, and implied there was little left to talk about, adding to defendant's apparent misperception the initial confession could be used against him. Other than the fact defendant responded to Newman's next question, there is little to support a finding defendant understood his rights or that the waiver was knowingly and intelligently given.

Under the circumstances presented here, procuring a valid waiver required some type of clarification of whether defendant understood his rights, including the right to counsel. (Cf. *People v. Clark* (1993) 5 Cal.4th 950, 991 [no *Miranda* violation where the "interrogators did not ask [the] defendant substantive questions until [the] defendant's position was clarified and a valid waiver was obtained" and "no coercive tactics were employed in order to obtain [the] defendant's *Miranda* waiver"].)

Defendant's arguments blend the waiver issue with an invocation of the right to counsel, but we need not reach the invocation issue. The facts demonstrate defendant did not knowingly and intelligently waive his rights regardless whether his question about counsel was an invocation.

### F. Mid-interrogation *Miranda* Warning Was Ineffective

In addition to all of the foregoing, the timing and circumstances of the *Miranda* warning given without any curative measures did not convey to defendant that he had any real choice with respect to his right to silence and to counsel. Even assuming arguendo a waiver could somehow be implied from the facts, under the governing United States Supreme Court case authority, the *Miranda* warning itself was legally ineffective and rendered any waiver meaningless.

#### 1. Governing Law

Because the *Miranda* warning was not given until mid-interrogation, this case falls squarely within the United States Supreme Court's decisions related to midstream warnings. The efficacy of a midstream warning, and its effect on a waiver of rights and

31.

subsequent inculpatory statements, is measured by the approaches outlined in *Elstad*, *supra*, 470 U.S. 298 and *Seibert*, *supra*, 542 U.S. 600.[5]

### a. *Elstad* and *Seibert*

In *Elstad,* an 18-year-old burglary suspect (Elstad) was arrested in his parents' home.  When an officer questioned him in the living room, Elstad made an incriminating statement.  He was thereafter transported to the sheriff's headquarters where he was advised of his *Miranda* rights for the first time.  Elstad indicated he understood his rights and gave a full written statement regarding his involvement in the burglary.  (*Elstad*, *supra*, 470 U.S. at pp. 300–301.)

The high court held Elstad's unwarned statement in the living room was inadmissible because no *Miranda* warnings had been given, but the written statement at the police station was fully admissible because it was obtained after Elstad was warned and voluntarily waived his rights.  The court explained the failure to administer *Miranda* warnings during a custodial interrogation, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise free will, does not mandate the exclusion of a subsequent statement voluntarily made by the defendant after he was advised of and waived his *Miranda* rights.  (*Elstad*, *supra*, 470 U.S. at p. 309.) The high court acknowledged, however, that if the prewarning statement is the product of actual coercion, "the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession." (*Id.* at p. 310.)  Thus, whether an initial failure to warn taints any subsequent warned statement, the touchstone inquiry is whether both prewarning and postwarning statements were voluntary under the traditional due process test.  (*Id.* pp. 317–318.)

---

[5]     While neither party cites or analyzes *Seibert*, and defendant only cites but does not analyze *Elstad*, these are the precedents that govern the outcome of their respective arguments.

In *Seibert*, the high court confronted a situation where officers engaged in a custodial interrogation of a suspect, intentionally withheld *Miranda* warnings until after the suspect confessed, then gave *Miranda* warnings and used the initial confession to procure a second, warned confession. There were express admissions the officers had been trained and intended to engage in a question-first, warn-later interrogation technique designed to undermine the *Miranda* requirements. (*Seibert*, *supra*, 542 U.S. at pp. 609–610 (plur. opn. of Souter, J.).)

In a plurality opinion, the *Seibert* court held *Elstad* did not authorize admission of a confession repeated under the question-first, warn later strategy, and the *Miranda* warnings given mid-interrogation were ineffective and the subsequent warned confession was inadmissible at trial. (*Seibert*, *supra*, 542 U.S. at pp. 614–615.) The court explained that in *Elstad*, "it was not unreasonable to see the occasion for questioning at the station house as presenting a markedly different experience from the short conversation at home; since a reasonable person in the suspect's shoes could have seen the station house questioning as a new and distinct experience, the *Miranda* warnings could have made sense as presenting a genuine choice whether to follow up on the earlier admission." (*Seibert*, *supra*, at pp. 615–616 (plur. opn. of Souter, J.).)

By contrast, the facts presented in *Seibert* revealed an intentional police strategy where the unwarned interrogation was "systematic, exhaustive, and managed with psychological skill," which left "little, if anything, of incriminating potential left unsaid." (*Seibert*, *supra*, 542 U.S. at p. 616 (plur. opn. of Souter, J.).) The subsequent warned portion of questioning proceeded with a pause of only 15 or 20 minutes in the same place as the unwarned segment and was conducted by the same officers. The court explained the warned portion of the interview left the impression that further questioning was a mere continuation of the earlier questions, which was "fostered by references back to the confession already given." (*Ibid.*) As a result, "[i]t would have been reasonable to regard the two sessions as parts of a continuum, in which it would have been unnatural to refuse

33.

to repeat at the second stage what had been said before" and these circumstances "must be seen as challenging the comprehensibility and efficacy of the *Miranda* warnings to the point that a reasonable person in the suspect's shoes would not have understood them to convey a message that she retained a choice about continuing to talk." (*Id.* at pp. 616–617, fn. omitted.)

The factual contrasts between *Elstad* and *Seibert*, the court reasoned, revealed a "series of relevant facts that bear on whether *Miranda* warnings delivered midstream could be effective enough to accomplish their object: the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." (*Seibert*, *supra*, 542 U.S. at p. 615 (plur. opn. of Souter, J.).) Whatever the subjective intent of law enforcement, the plurality indicated its multi-factor test would apply whenever facts show the question-first tactic at work. (*Id.* at p. 616, fn. 6 ["[T]he intent of the officer will rarely be as candidly admitted as it was [in *Seibert*] (even as it is likely to determine the conduct of the interrogation)[; thus,] the focus is on facts apart from intent that show the question-first tactic at work."].)

Justice Kennedy issued a separate opinion, concurring in the judgment but rejecting the plurality's conclusion a "multifactor" test should apply whenever a two-stage interrogation occurs. (*Seibert*, *supra*, 542 U.S. at p. 622 (conc. opn. of Kennedy, J.).) Justice Kennedy fashioned an inquiry focused on whether the officers deliberately employed a two-step interrogation designed to undermine the effectiveness of *Miranda* warnings. If the two-phase interrogation was deliberate, then any postwarning statement related to the substance of prewarning statements must be suppressed "absent specific, curative steps." (*Seibert*, *supra*, at p. 621 (conc. opn. of Kennedy, J.).) On the other hand, if the two-step interrogation was not deliberate, then Justice Kennedy believed

*Elstad* should continue to govern the admissibility of a postwarning statement: whether the prewarning and postwarning statements were voluntary. (*Id.* at p. 622.)

"The fractured nature of *Seibert* has given rise to a debate over whether it is the plurality's opinion or Justice Kennedy's concurrence that provides the controlling standard." (*People v. Krebs* (2019) 8 Cal.5th 265, 309 [noting the 6th Cir. Ct. of Appeals has adopted the plurality's multi-factor test, but the 2d, 3d, 5th, 8th, 9th, and 11th Circuits have all adopted Justice Kennedy's approach as the holding of the *Seibert* court] (*Krebs*).) The California Supreme Court has not yet determined which approach controls, concluding in *Krebs* it was unnecessary to address the question because the defendant's argument failed under either. (*Ibid.*)

### b. Analysis

*Seibert* and *Elstad* create the governing framework for the admissibility of warned statements in a two-part custodial interrogation—the first part unwarned, the second part warned. Factually, this case falls squarely within the *Seibert* category of midstream warnings and not that of *Elstad.* Defendant's interview was different from *Elstad* in every meaningful respect. Defendant was subjected to a single, unbroken interview conducted by the same detective during which he was unquestionably in custody.

Under *Seibert*, the initial question is which approach should be applied—the plurality opinion or Justice Kennedy's concurrence, which supplied the fifth vote to affirm the judgment below. The plurality approach would arguably subject every two-part interview with a midstream warning to a multi-factor test to ascertain the efficacy of the untimely warning, while Justice Kennedy's approach would analyze such circumstances under *Elstad*'s voluntariness test absent evidence that a deliberate question-first, warn-later strategy was implemented.

Like *Krebs*, however, this case does not require us to address that issue. Under neither the plurality opinion nor Justice Kennedy's concurrence would the *Elstad*

35.

voluntariness test apply. The inquiry under Justice Kennedy's concurrence is whether a deliberate two-step strategy has been used; if it has, then "postwarning statements that are related to the substance of the prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made." (*Seibert*, *supra*, 542 U.S. at p. 622 (conc. opn. of Kennedy, J.).) Here, because there is evidence a deliberate question-first, warn-later strategy was implemented, even applying Justice Kennedy's approach, defendant's second warned confession must be excluded because no curative measures were taken.

Although different from *Seibert* in that there was no express admission by Newman that he intended to employ a question-first tactic, the circumstances abundantly demonstrate a deliberate strategy. In his concurrence, Justice Kennedy sought to limit application of the plurality's multi-factor test to those "infrequent" cases "in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning." (*Seibert*, *supra*, 542 U.S. at p. 621 (conc. opn. of Kennedy, J.).) Establishing the use of a deliberate two-step interrogation calculated to frustrate the *Miranda* rule does not demand an admission by law enforcement, and Justice Kennedy's concurrence did not say otherwise. When the circumstances show a deliberate two-step strategy was employed, the intent of the interviewing officer can be inferred. (See generally *People v. Matson* (1974) 13 Cal.3d 35, 41 [because intent is rarely susceptible of direct proof, it may be inferred from all the facts and circumstances disclosed by the evidence].)

The circumstances here establish the use of a deliberate and calculated strategy to question first and warn later. When Newman began the interview with defendant, he already knew most of the details about the shooting and had connected them to defendant, including where defendant had obtained the weapon. There is no doubt Newman went into the interview to question defendant about the shooting—it was intended to be an interrogation, plain and simple.

When Newman first introduced himself to defendant as a detective, he indicated he wanted to talk to defendant and asked if he could make defendant more comfortable. The message Newman implicitly sent was that the "talk" was not going to be for mere booking purposes or short in duration. Defendant immediately told Newman he would "rather not talk about anything today." Rather than advising defendant of his *Miranda* rights, including the one he invoked, Newman sidestepped defendant's statement by saying he only wanted to ask "a few questions" to "know a little bit more about" defendant. Of course, this was untrue—defendant was the primary suspect in a fatal shooting Newman was investigating.

Newman ignored four more of defendant's statements he did not want to talk about anything and moved into questions of interest in the investigation, asking defendant about his cell phone and how long he had been living at DeJong's property. Given the obvious purpose of the interview and defendant's immediate and multiple statements he did not want to talk, Newman's questioning showed careful calibration to keep defendant talking while weaving in questions relevant to the investigation. When defendant abruptly said he just wanted to talk about what happened, Newman knew exactly what defendant was referring to and that "what happened" would almost certainly lead to the elicitation of incriminating statements—whether or not defendant denied or admitted being the shooter. Yet, even at this point, Newman still declined to give any *Miranda* warning.

After defendant initially admitted to shooting DeJong, Newman continued to prompt him to say more, asking about the location of the house defendant was working on remodeling for Dennis and telling defendant he had already talked to Dennis, who "was pretty surprised about all this." In response, defendant then gave more detail about why he shot DeJong. Without a doubt, Newman was attempting to elicit incriminating statements about the shooting and was carefully priming defendant to reveal as much

37.

information as possible—this was unambiguously interrogation at a time Newman knew no warnings had been given.

When defendant wound down his explanation and said he "wanted to hang [himself] on a tree or something," Newman finally provided warnings, but he hurried through defendant's uncertainty about the need for a lawyer; the video and transcript of the interview do not show clearly that defendant acknowledged he understood his rights when asked, Newman never confirmed with defendant he was actually waiving his rights in the face of defendant's questions about a lawyer, and Newman underplayed the scope of what was left to talk about by saying he only had a few more questions, which was categorically untrue.

The two-stage interview tactic was deliberate. There was no ambiguity about the circumstances, interrogation was clearly and concededly engaged in before warnings were given. Newman's persistent avoidance of providing a warning was deliberate and calculated to ensure further questioning would be unimpeded. He knew he had a duty to warn, but kept defendant talking until a confession was obtained. Only then was a warning given. Defendant's uncertainty about counsel at the time of waiver was brushed aside as essentially unimportant because Newman "just had a few questions" left. Newman then proceeded to go through every detail of the shooting and the kidnapping with defendant for another 90 minutes, which strongly suggests Newman knew the initial, unwarned confession was likely inadmissible. There is no reasonable way to conclude this was anything but deliberate.

As there is convincing and ample evidence of a deliberate, calculated strategy to undermine the efficacy of the *Miranda* warning by delaying it, postwarning statements related to the prewarning statements must be suppressed if no curative measures were taken. (*Seibert*, *supra*, 542 U.S. at p. 622 (conc. opn. of Kennedy, J.).) Curative steps suggested by Justice Kennedy to ensure a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning include a break in time

38.

and circumstance between the prewarning and postwarning statements. (*Seibert*, *supra*, at p. 622 (conc. opn. of Kennedy, J.).) Or, alternatively, a warning that explains the likely inadmissibility of the prewarning custodial statement. (*Ibid.*) There were no curative measures taken here. The interview was conducted in one continuous two-hour session without so much as a break between the unwarned and warned portions—there was no attenuation in time or location between the two confessions to the shooting. And, as defendant points out in his reply brief, there was no advisement by Newman of the likely inadmissibility of defendant's prewarning confession.

Turning to *Seibert*'s multi-factor plurality approach, the postwarned statements are also inadmissible. Factors that bear on the efficacy of a midstream *Miranda* warning include the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and second round, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first. (*Seibert*, *supra*, 542 U.S. at p. 615 (plur. opn. of Souter, J.).)

On balance, these factors tilt strongly toward a conclusion the efficacy and comprehensibility of the *Miranda* warning were fatally compromised. (*Seibert*, *supra*, 542 U.S. at p. 617 (plur. opn. of Souter, J.).) There was strong overlapping content of defendant's prewarned and postwarned statements regarding the shooting and defendant's motive, although more details were gleaned in the warned portion of the interview. And while Newman's questions during the prewarned interrogation were not detailed as they tended to be prompting-type questions meant to continue moving defendant through his confession, defendant's narrative was detailed. He explained how he came to live on the property and how his frustration with DeJong had been building because he treated defendant like a lackey and seemed to be coming between defendant and Bonnie. He also explained he had stayed awake the whole night before the shooting smoking methamphetamine, DeJong had been treating him terribly and defendant was

39.

angry about Bonnie, and then defendant shot DeJong with the handgun he had gotten to protect the property. The prewarned interrogation was not exhaustive to the degree in *Seibert*, nor did Newman treat the warned portion like a cross-examination of the statements made in the unwarned portion, but the most damning details that defendant had shot DeJong and why he had done so were confessed in the unwarned portion of the interrogation and then discussed at length again in the warned portion.

The warned phase of the interrogation proceeded with no pause at all, in the same place as the unwarned portion, and Newman conducted the entire interview. When Newman recited the *Miranda* warning, he said nothing to counteract any misperception what defendant had already said could be used against him. When defendant questioned the need for an attorney, noting he had already confessed, Newman implied it was not necessary and there was not much left to talk about anyway. Defendant's question about his right to counsel under the circumstances was more evidence the warnings were incomprehensible to defendant. And understandably so—his requests not to talk in the beginning were not honored, which implied he did not have the right to silence then, yet postconfession he was instructed he suddenly had a right to remain silent and the right to counsel at a time when the benefit of exercising those rights seemed dubious at best. A reasonable person in defendant's shoes would not have understood the *Miranda* warning to convey a message he had any real choice about continuing to talk. Not only are defendant's prewarning statements inadmissible as the People concede, the postwarning statements are likewise inadmissible under *Seibert*. (*Seibert*, *supra*, 542 U.S. at pp. 616–617, (plur. opn. of Souter, J.).)[6]

---

[6] To the extent defendant's postwarning statements about holding Bonnie "hostage" were not related to his prewarning statements about the shooting, those statements must nonetheless be suppressed for all the reasons already discussed.

## II. The Admission of Defendant's Confessions Was Prejudicial

We turn now to the question of prejudice. The erroneous admission of statements obtained in violation of *Miranda* is reviewed for prejudice pursuant to *Chapman v. California* (1967) 386 U.S. 18. (*Arizona v. Fulminante* (1991) 499 U.S. 279, 296, 310; *People v. Cunningham* (2001) 25 Cal.4th 926, 994.) This test requires the People "to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman*, *supra*, at p. 24.)

"The standard is satisfied only if '[t]here is no reasonable possibility that the verdict would have been more favorable to [the] defendant had [the] statements not been admitted.' [Citation.] Because confessions '"[a]lmost invariably" will provide persuasive evidence of a defendant's guilt …, the improper admission of a confession is much more likely to affect the outcome of a trial than are other categories of evidence, and thus is much more likely to be prejudicial under the traditional harmless-error standard.'" (*People v. Henderson* (2020) 9 Cal.5th 1013, 1029.)

"A confession is like no other evidence. Indeed, 'the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him.… [T]he admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct. Certainly, confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so.' [Citations.] While some statements by a defendant may concern isolated aspects of the crime or may be incriminating only when linked to other evidence, a full confession in which the defendant discloses the motive for and means of the crime may tempt the jury to rely upon that evidence alone in reaching its decision." (*Arizona v. Fulminante*, *supra*, 499 U.S. at p. 296.)

Defendant's confession supplied the best and most compelling evidence the killing was willful, deliberate and premediated—a necessary element to support the first degree

41.

murder conviction. (§ 189, subd. (a) [willful, deliberate, and premeditated killing is murder of the first degree].) And, unsurprisingly, because his interview statements were the most compelling evidence in this regard, they were the centerpiece of the prosecution's closing arguments on this issue.

In asserting the crime was willful, deliberate and premeditated, the prosecutor highlighted defendant admitted to shooting DeJong in the head—not that he was aiming for another body part, was trying to fire over his head, or was otherwise attempting to scare DeJong. Defendant's statements confirmed that shooting DeJong in the head was no accident. For purposes of deliberation, the prosecutor argued defendant's interview statements also showed he weighed the consequences of his choices, "because there was a lot of evidence in that statement that he did," including that defendant told Newman he took everything he wanted for once in his life by shooting DeJong. The prosecutor argued premeditation was shown through acquiring the weapon ahead of time from Dennis, but also that defendant told Newman he felt that DeJong had been demeaning him in front of Bonnie, including just before the shooting.

The jury was instructed on voluntary manslaughter based on heat-of-passion evidence defendant thought DeJong and Bonnie had been engaged in a sexual act when he went into the shed and shot DeJong. The prosecutor argued the shooting was not done in the heat of passion based on defendant's statement to Newman he did not do anything at the moment he heard DeJong yell out to D.N.; thus, there was a cooling off period and defendant did not react immediately. The prosecutor emphasized defendant's admission to Newman that he was waiting for DeJong to come out of the shed, and when DeJong did not appear, defendant sought him out in the shed. The prosecutor argued this too reinforced the conclusion defendant's actions were deliberate.

Bonnie did not see defendant waiting outside the shed prior to the shooting, nor was she privy to any of the internal thought processes he revealed to Newman. She testified defendant had been acting possessive and jealous about her; defendant had been

by the shed several times to ask Bonnie to spend the night with him and DeJong kept telling him to leave; and defendant told Bonnie later that he misunderstood what DeJong yelled back to D.N. just before the shooting, that he was angry Bonnie would not spend the night with him, and that he had had enough of DeJong mistreating him, but that he should not have shot DeJong. There was also testimony from the coroner the gun that killed DeJong was fired from a distance of less than two feet, and the gun—found in the bushes where Bonnie said it would be—matched the type of gun Dennis had given defendant. But taken together in the absence of defendant's statements, this was not overwhelming evidence defendant's shooting of DeJong was necessarily willful, deliberate and premeditated. Nor did it overwhelmingly eliminate the possibility the killing was done in the heat of passion, given Bonnie's testimony of her sexual relationship with defendant, defendant's jealousy, and his mistake about what DeJong had yelled to D.N. just before defendant entered the shed and shot DeJong. Indeed, the prosecutor urged the jury to conclude the evidence proved first degree murder and not voluntary manslaughter by pointing almost exclusively to defendant's interrogation statements.

As to the kidnapping conviction, defendant acknowledged during his interview that he "took [Bonnie] to the room" because he "just wanted one more night with her," but "she was uncomfortable the whole time 'cause [he] was holding her hostage." Although mentioning Bonnie's testimony in closing arguments, the prosecutor again emphasized defendant's statements, noting they showed he knew Bonnie did not go with him willingly and they corroborated Bonnie's testimony.

Other than defendant's confession, Bonnie's testimony was the only evidence of the kidnapping—it was not supported by other disinterested and reliable eyewitnesses, nor was it confirmed by uncontroverted physical evidence. (See *People v. Cahill* (1993) 5 Cal.4th 478, 505 [offering a series of nonexhaustive examples to illustrate when erroneous admission of confession might be found harmless].) While Bonnie's testimony

43.

alone was certainly sufficient to support the verdict, it is impossible to know how the jury would have weighed or credited it in the absence of defendant's statements. Defendant's statements by themselves supported the verdict regardless of how the jury viewed Bonnie's testimony. Importantly, they also corroborated Bonnie's testimony in almost all salient respects. Although her version of events was undisputed, Bonnie did not have unblemished credibility. She was not a disinterested witness, and she admitted she had been smoking methamphetamine and marijuana with defendant the entire day before the shooting. Defendant's confessions bolstered any credibility or believability issues her testimony may have presented for the jury.

For these reasons, while there was independent evidence defendant shot and killed DeJong, we cannot conclude the guilty verdicts for first degree murder and kidnapping were "'surely unattributable'" to the admission of defendant's confessions. (*People v. Quartermain* (1997) 16 Cal.4th 600, 621.)

## III.   Remaining Arguments

In light of our conclusion defendant's convictions must be reversed, the remaining assertions of error are moot and we do not address them.

**DISPOSITION**

The judgment is reversed.  The matter is remanded to the trial court for further proceedings consistent with this opinion.


                                                    MEEHAN, J.

WE CONCUR:


POOCHIGIAN, Acting P.J.


DETJEN, J.